

**IT IS ORDERED as set forth below:**

**Date: May 22, 2020**

_____
**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 13-42906-BEM |
| EDWARD BYRON SLAUGHTER et al., | |
| Debtors. | CHAPTER 11 |

### ORDER ON MOTION TO REQUIRE COMPLIANCE WITH CHAPTER 11 PLAN AND CONFIRMATION ORDER

This case came before the Court for hearing on April 15, 2010, (the "Hearing") on the Motion To Require Compliance With Chapter 11 Plan and Confirmation Order, To Enjoin Further Violations By The Holder Of Class 1 Claim and Its Affiliates, And To Award Costs And Expenses [Doc. 547] filed by E. Byron Slaughter, LLC (the "Motion" and "Reorganized Debtor," respectively) and the Response to the Motion (the "Response") filed by Apex Bank ("Apex") [Doc. 548]. Counsel for Reorganized Debtor, J. Nevin Smith, and counsel for Apex, Thomas D. Richardson, presented argument and Reorganized Debtor submitted exhibits to the Court at the Hearing. At the conclusion of the Hearing, the Court provided both counsel the opportunity to submit additional briefing on the issues the Court addressed at the Hearing, as follows: (i) whether

the Confirmed Chapter 11 Plan dated December 1, 2015 [Doc. 391] (the "Plan") requires Apex to apply the amount of any promissory notes in favor of Reorganized Debtor and assigned to Apex to the principal amount of CRE's Claim[1] (the "Claim"), (ii) the meaning of the term "market" in the Plan with regard to what marketing efforts are required to comply with the Plan, and (iii) whether the term "third party" as set forth in Article IV (c) is limited to all potential purchasers except the Reorganized Debtor or if it is more expansive and excludes Reorganized Debtor and all of its affiliates.

With respect to the first issue, the Court concludes that the Plan does not require Apex to apply the amount of any note receivable assigned to it by Reorganized Debtor to the principal balance of the Claim and allows for application as payments are received under any such note. The Plan provides that the Reorganized Debtor will make monthly payments in the amount of $11,482.47[2] and will pay the Claim in full in the 60th month following the Effective Date of the Plan. [Doc. 391 at 4-5]. The Plan further provides that Reorganized Debtor shall market and may sell property subject to certain price floors and to pay net proceeds to Apex. [Id. at 5]. If Reorganized Debtor's argument is accepted, Apex must credit the full amount of the notes receivable taken by Reorganized Debtor for sale of property and the Claim will be reduced, but will not have paid. Indeed, the Claim will not be paid until the note receivable is paid in full at some indeterminate time in the future such that paying the Claim in full no later than the end of the 60th month may be nullified and the full payment term may be extended beyond that contemplated by the Plan. This cannot be the intention of the Plan provisions providing for

---

[1] Terms defined in the Plan but undefined in this Order shall have the meaning set forth in the Plan. Apex is the current holder of CRE's Claim.

[2] The Plan provides some flexibility with respect to a default in interest payments as follows: "to the extent that cash flow during any particular month is insufficient to permit Debtor to make the Regular Monthly Plan Payment, then CRE in its sole discretion, may allow Debtor to pay as much of the Regular Monthly Plan Payment as cash flow permits and then pay the shortfall during the next month or as soon thereafter as cash flow permits." [Doc. 391, p. 5].

2

payment of the Claim. Furthermore, if Reorganized Debtor's argument regarding its ability to require Apex to accept notes receivable from owner financed sales of property and apply the note amount to principal is accepted it would shift the risk of non-payment in the sales context to Apex when the Plan plainly indicates that Apex is to receive payment of net sales proceeds at closing. For the reasons stated on the record[3] and as supplemented herein, the Court concludes that the Plan does not require Apex to credit the amount of any note receivable assigned to it by Reorganized Debtor upon receipt of such note, but allows for application as payments are received.

With respect to the second issue, the Court stated that marketing should be considered in light of Section 363 of the Bankruptcy Code and the marketing efforts that are generally accepted in chapter 11 cases should be used as a guide to determine the level of marketing necessary under the Plan. The Court also directed the parties to work together in determining what level of marketing is required. The parties were unable to agree, and each has submitted proposed marketing requirements to the Court.

Apex submitted the following marketing proposals and proposed that Reorganized Debtor must use all four methods of marketing:

> The property shall be posted for sale with appropriate signage.
>
> The property shall be listed for sale with a real estate broker licensed in the State of Georgia approved by Bank and approval will not be unreasonably withheld.
>
> The property shall be offered for sale on multiple internet websites reasonably calculated to reach the largest market in the U.S.
>
> The property shall be offered for sale by means of local, regional, and national advertising.
>
> The property shall not be listed for less than 90% of market value. The property must be properly marketed using all 4 of the above marketing tools. If the property

---

[3] At the Hearing, I said that I believed the loan documents precluded Reorganized Debtor's waiver argument but could not cite the provisions in the loan documents. Having reviewed Claim 1 filed in the Reorganized Debtor's case, case no. 13-42907, the Court confirms its statement and refers specifically to ¶ 8, p. 15; § 2.14, p. 34.

3

has an offer (from a non-affiliated third party) the borrower shall submit to Bank how the property was marketed prior to Bank's being required to accept the sale. Bank shall determine if the property was marketed properly.

Auctions are not a proper tool for these properties. In past auctions allowed by the Bank, Bank was willing to allow Debtor to seller finance specific individual properties and take the seller financed notes as collateral, which led to a broader market base for an auction. Bank is no longer willing to allow Debtor to seller finance; auctions then would primarily focus on investors which would not represent a proper marketing of the property.

Reorganized Debtor submitted the following marketing proposals with the condition that one or a combination of the methods be used, in Reorganized Debtor's business judgment:

Listing such Property for sale with a real estate broker licensed in the State of Georgia and doing business in Polk County, Georgia.

Offering such Property for sale on an internet website reasonably calculated to reach local market in Polk County, Georgia.

Offering such Property for sale by means of local advertising, including without limitation, on site property "for sale" signs.

Including such property in an in-person or on-line auction with a reputable auction company doing business in Polk County, Georgia with attendant advertising or other market exposure customarily employed by auctioneers in Polk County, Georgia.

In considering the two marketing proposals, the Court observes that there are substantial similarities in the parties' proposals.  In general, Reorganized Debtor appears to seek to limit the breadth of marketing more locally to Polk County while Apex seeks a broader market that does not include auctions. Considering the general themes of marketing through Section 363 sales, the marketing effort should take into consideration the time available, fully exposing the properties to a market broad enough to attract a range of potential buyers and to maximize the price of potential sales. With these considerations in mind, the Court finds that any two of the following methods plus posting appropriate signage on the properties, at a minimum and without

4

limiting the use of additional marketing methods, constitutes marketing as contemplated in the Plan.

1. Marketing through a Georgia licensed broker having experience in the Northwestern Georgia real estate market.

2. Marketing on one or more internet website(s) reasonably calculated to reach at least a local and regional market.

3. Advertising through local and regional means, but not excluding national advertising.

4. Including property in an in-person or on-line auction with a reputable auction company doing business in the Northwest Georgia region with usual and customary marketing exposure through advertising or other means.

In addition, Reorganized Debtor shall provide Apex with evidence to establish the methods used for the sale of each property it seeks to sell.

The dispute as to the interpretation of the term "third party" arises because Apex has not given Reorganized Debtor payoff information for certain properties it proposes to sell. Reorganized Debtor argues that the Plan requires Apex to provide it a payoff amount and release its lien if the gross sales price is above the floor set forth in the Plan and Apex receives the net sales proceeds. Apex, in response, argues that Reorganized Debtor has not marketed the property, but merely seeks to sell it to an affiliate and that the term "third party" in the Plan excludes any affiliate of Reorganized Debtor. Apex argues that it is entitled to information about the ownership of the proposed buyers to determine whether they are affiliates and thus, in Apex's view, excluded from purchasing the property, in which case it need not provide payoff amounts.

At the Hearing, the Court indicated its view that the term "third party" includes anyone other than Reorganized Debtor, such that an affiliate may be a third party. Apex availed itself of the opportunity to submit a supplemental brief addressing the interpretation of "third

5

party" in the Plan. [Doc. 555]. First, Apex argues that the Court must always consider the context in which a contractual term appears in determining its meaning, *Archer W. Contractors, Ltd. v. Estate of Pitts,* 292 Ga. 219, 224, 735 S.E.2d. 772, 777 (2012), and thus must look beyond Article IV, paragraph (c) of the Plan and consider the background of the Reorganized Debtor and its four affiliates (the "Debtors") in this jointly administered case and the goals of the Plan. Apex points to the Amended Disclosure Statement which describes the Debtors as a group of affiliated entities solely owned and managed by E. Byron Slaughter ("Mr. Slaughter") that have been in the business of buying, selling, managing, leasing and otherwise operating various properties in Mr. Slaughter's name or various limited liability corporations for approximately 30 years. [Doc. 392 at 3]. Apex further points to the use of the same language in the disclosure statement for Mr. Slaughter's individual bankruptcy case and points out that the disclosure statements in both cases used the exact same description for the events leading to the chapter 11 filing. [See Docs. 392, 388].

Apex argues further that the term "third party" is ambiguous because it is subject to more than one reasonable interpretation and that three general rules govern the interpretation of ambiguous contracts. Thus, it argues that the Court should apply these rules to determine the intent of the parties in using the term "third party" in the Plan. [Doc. 555 at 4-5, citing *Hill v. Greentree Serv., LLC (In re Hill)*, 572 B.R. 793, 799-800 (Bankr. N.D. Ga. 2017) (Hagenau, J.)].

The first of these rules of contract construction is that the Plan should be interpreted to comply with the Bankruptcy Code. 572 B.R. at 799. Here, a construction of "third party" that either is limited to only non-affiliated entities and individuals or is limited only to the Reorganized Debtor is consistent with the Code. However, affiliated purchaser(s) would generally be subject to stricter scrutiny in terms of the bona fides of a sale in the context of a bankruptcy case and in general commercial practice.

6

The second rule of contract construction is that the Plan should be interpreted in light of the circumstances and the principal purposes of the Plan. *Id.* at 800. Apex argues that the purpose of the Plan is to maximize the prices obtained in sales of property for Reorganized Debtor and Apex's benefit, and allowing sales to affiliates of Reorganized Debtor at 60% of the 2013 tax assessed value of the property defeats that purpose. Apex argues further that requiring Reorganized Debtor to market the properties does not make sense if sales to affiliates were contemplated by the Plan. In support of this position, Apex points out that Debtors are described together and constitute one general enterprise.

Reviewing the record in the jointly administered cases, it appears that while the Debtors all managed and sold properties pre-petition and contemplate doing so post reorganization, that the properties owned and the debts secured thereby are different for each debtor with some overlap as co-debtors and that Mr. Slaughter guaranteed Reorganized Debtor's obligations to Apex.  The Plan provides for monthly interest payments for 59 months on the Claim and provides that, "[o]n the last day of the 60th calendar month following the Effective Date of the Plan, the entire outstanding balance of CRE's Claim plus any accrued but unpaid interest shall be due and payable in full[.]" [Doc. 391 at 5]. The Plan further provides that the Reorganized Debtor "shall market the [Apex] Collateral for sale" and that [Reorganized] Debtor "may sell" property to "a third party" as long as the sales price is not below the floor specified in the Plan. [Doc. 391 at 5]. Reorganized Debtor's Disclosure Statement indicates that the Plan will be funded "from operating revenue and/or income generated from the sale of properties." [Doc. 392 at 13].  The Disclosure Statement also provides that Reorganized Debtor will either refinance its obligations or sell properties to make the payment due in month 60.  [Id.].

7

Considering the entire record, including the Disclosure Statement and Plan, leads the Court to concur with Apex that the primary goal of the Plan is to maximize the amounts received from the sale of properties to pay the Claim both over the course of the 59 months and in full in month 60. The time provided allows for a full marketing effort and the discretion given allows Reorganized Debtor to reject an offer that, while it may fit within the Plan parameters, may be considered too low. In addition, the 60-month Plan term provides significant time for Reorganized Debtor to seek to refinance the collateral or some portion thereof. To facilitate these purposes, an interpretation of "third party" that is most likely to maximize the sales prices of property is most consistent with the intentions of the parties to the Plan.

The final rule of construction set forth in *Hill* is to construe the Plan against the drafter. 572 B.R. at 800. Reorganized Debtor was the Plan proponent. At the Hearing, counsel for Reorganized Debtor argued that the Plan was negotiated with counsel for CRE such that this rule should not be utilized. It does appear that there was some negotiation of the treatment of the Claim as the Plan provides for an agreed and stipulated value and the amount to be paid to CRE on the Effective Date was increased in the Plan as compared to the original plan filed by Reorganized Debtor [Doc. 336] and the minimum amount to be paid to CRE from cash held at the Effective Date was removed from the Plan. CRE voted in favor of the Plan, and during the confirmation hearing CRE's counsel noted that he thought a separate order on confirmation of the Plan should be entered and he was sure Reorganized Debtor's then counsel would "run the order by him". Thus, it appears that there was negotiation in the treatment of the Claim. Confirming a chapter 11 plan on a consensual basis usually requires negotiation with creditors and especially the senior secured creditor of a debtor. Therefore, the fact that there were negotiations with CRE's counsel does not turn CRE into a joint plan proponent. However, given that CRE was the largest creditor

and without its consent a cram down plan would have been necessary, the Court believes application of this rule of construction is of limited value in this case. Rather the Court finds that the key to interpreting the Plan terms is the primary purpose of the Plan as agreed by [Reorganized] Debtor and CRE. Having considered the context in which the Plan was proposed and confirmed and the purpose of the Plan the Court concludes that the parties intended for the term "third party" to exclude Reorganized Debtor and its affiliates.

The Court notes, in the context of the proposed sales that caused the dispute between Reorganized Debtor and Apex, that to the extent Apex consents to a sale to an affiliate, heightened scrutiny such as requesting information on members of an LLC or financial information from Mr. Slaughter would not be unreasonable in determining if Apex may wish to make an exception to the third party requirement in the future. Indeed, even if this is not the case, the provisions of the CRE loan documents provide Apex with the right to review Reorganized Debtor's and Mr. Slaughter's books and records (as guarantor). [POC 1, § 1.13; POC 1, p. 7]. Similarly, if Apex consents to owner financing in the future that too is not precluded by this order.

In addition to the issues discussed above, the Motion requested an award of attorney fees. At the Hearing, the Court announced that the request for attorney fees would be denied, and the Court finds no reason to revisit or supplement that ruling. For the reasons stated on the record and herein, it is now

ORDERED that the Motion is DENIED.

**END OF ORDER**

**Distribution List**

Thomas D. Richardson
Brinson, Askew, Berry, et al
P. O. Box 5007
Rome, GA 30162-5007

J. Nevin Smith
Smith Conerly LLP
402 Newnan Street
Carrollton, GA 30117

E. Byron Slaughter, LLC
P.O. Box 858
Rockmart, GA 30153

Vanessa Leo
Office of the U. S. Trustee
362 Richard Russell Federal Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303